Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff entered into a contract with the Army Corps of Engineers for the construction of a pumping station in the *76 Florida Everglades. The pumping station was part of the Central and Southern Florida Flood Control Project. One of the purposes of the Florida flood control project is to cope with the problems presented by storm and flood in the Lake Okeechobee and Everglades areas of Florida. To allay the heavy annual flood damage characteristic of the Okeechobee-Everglades region, the Congress has appropriated substantial amounts in aid of the Central and Southern Florida Flood Control Project.[1] These funds have been used for flood control measures such as the construction of the pumping station, known as Pumping Station No. 9, which is the subject matter of this case.
The plaintiff experienced considerable difficulty and delay in the performance of this contract. As a consequence, the plaintiff says increased costs resulted from excess dewatering costs and delay. In the first count, plaintiff contends the excess dewatering costs claimed, as well as the delays, resulted because the defendant either misrepresented or withheld material facts. In this first count plaintiff also alleges that defendant approved use of a dewatering method that it had concluded would not work. In the second count, plaintiff contends that the excess dewatering costs claimed, as well as the delays, resulted from encountering a “changed condition” under Article 4 of the contract. Finally, the plaintiff seeks remission of liquidated damages assessed on account of delays in completing the work. The plaintiff therefore asks for $604,816.01 for alleged additional costs and also for the amount deducted as liquidated damages of $75,100, making a total of $679,916.01.
We shall first inquire into plaintiff’s allegation in its first count that the defendant did not sufficiently apprise plaintiff of information possessed by defendant. In essence, plaintiff’s claim in this count is this: the plaintiff informed the defendant of its plan to use wellpoints for dewatering the construction site but the defendant, in spite of knowledge that wellpoints would not be effective, remained silent. Moreover the plaintiff asserts that the defendant breached a contractual obligation in approving a dewatering plan submitted *77 by plaintiff when the defendant, on the basis of its information, knew that the plan would not work.
To determine the validity of these contentions we must examine the information that had been accumulated by the defendant. Before we can assay the significance of this information, however, a comment is necessary concerning two methods of dewatering in use in Florida at the time of this contract. One method consists of pumping the water out with open pumps or wellpoints. The other method consists of walling off or sealing off the water with a cofferdam, and then pumping from the cofferdam with open pumps to control any influx from below. The plaintiff says the defendant should have insisted on a method of dewatering other than wellpoints in view of the information defendant possessed. What then was the information that had been accumulated by the defendant ? For more than 2 years before asking for bids, the Corps of Engineers had been gathering information regarding subsurface conditions at Pumping Station No. 9.[2] Bore holes were drilled. In connection with these, recharge tests were taken, i.e., holes were recharged with water to see how much could be put into a known depth of open hole. The Corps of Engineers, on the basis of these and later recharge tests, concluded that the most economical and practical method of dewatering was by the use of sheet steel cofferdams plus consolidation grouting with pumping from sumps.
The Corps of Engineers decided that the sole use of a wellpoint dewatering system was not feasible in view of the cost of drilling, and the fact that it was estimated the water flowing into the construction area would exceed 100,000 gallons per minute unless some means were used to retard the entry of water into the area.[3] The Foundation and Materials Branch of the District Engineer’s office declared on August 24, 1953, that “the conditions indicated by recharge tests in the core borings suggest that unwatering by pumping alone would probably be infeasible.”[4] On August 14, 1953, a conference attended by representatives of the Corps of Engineers was held in Jacksonville to discuss *78 Pumping Station No. 9, and to approve specifications for its construction. The Chief of the Foundations and Materials Branch told the conference that, on the basis of recharge test and seepage data, it was his opinion that the foundation area would hold 160,000 gallons of water per minute based on open pumping. It was concluded at the conference that cofferdam and foundation grouting should be used to dewater the site, and that by using this method the amount of water to be removed would be reduced to 10,000 gallons per minute. This conclusion of the Corps of Engineers was of course in sharp contrast to the conclusion of plaintiff’s subcontractor, Moretrench, that only up to 30,000 gallons of water per minute would be encountered.
The defendant says it did not reveal its conclusions to bidders largely because of the uncertainty and unreliability of the conclusions. However, the defendant insists that all the facts upon which defendant based its conclusions were made available to plaintiff. Furthermore, the defendant argues that the plaintiff indicated that it was not concerned with the defendant’s view with regard to the most effective method of dewatering but was placing all its trust on its subcontractor, Moretrench. Thus, when plaintiff was questioned about the 30,000 gallons-per-minute figure reached by Moretrench, the plaintiff was unable to show any computation to support that figure.[5] The trial commissioner found that the subcontractor’s local manager, Mr. Callender, had a part in reaching the 30,000 gallons-per-minute figure. However, the trial commissioner also found that Mr. Callender did not put much stock in the recharge tests and believed that the defendant had overestimated the amount of water to be encountered.
The pattern of plaintiff’s complete reliance on Moretrench is borne out by other events. When Moretrench presented its dewatering plan which called for the use of wellpoints, defendant’s project engineer became disturbed by the plan, and asked the Chief of Foundations and Materials why there was such a difference between plaintiff’s bid and the defendant’s estimated costs for the dewatering. Defendant’s project engineer then told plaintiff’s superintendent he did *79 not believe the contract for Pumping Station No. 9 was a job which, could be dewatered with wellpoints alone. The plaintiff’s superintendent replied that plaintiff had a contract with the Moretrench people and “it was their baby.”[6] When the plaintiff asked defendant’s project engineer what should be done, the engineer replied that while he did not disagree that the dewatering could be done with wellpoints, he believed it could be done only in conjunction with steel sheet cofferdams. Plaintiff’s superintendent replied this was a matter to be worked out with Moretrench. At this point, defendant’s project engineer told plaintiff’s superintendent that until the matter was worked out, he would withhold approval of the dewatering plan. The project engineer withheld approval until he was informed by his superior that plaintiff’s vice president, Mr. Lamar Smith, was complaining because the plan had not been approved. The defendant’s project engineer was then instructed to forward the plan to the defendant’s Jacksonville office. The project engineer obeyed these instructions but stated pointedly that he was making no comments concerning the adequacy of the plan.[7]
The defendant formally approved the plan on January 5, 1954. It is the approval of this plan, an approval insisted upon by plaintiff’s vice president, which plaintiff complains about here. We think the plaintiff’s behavior on this point estops it from complaining of the approval which it previously demanded. Moreover, the specifications themselves contain the following provision:[8]
1-02 Dewatering:
a. * * *
Approval of dewatering plans by the Oontraoting Officer mil not relieve the Contractor of responsibility for the adequacy of the method used or from furnishing all equipment, labor and material necessary for dewatering the work, nor shall such approval be construed as obligating the Government for any loss or damage resulting from flooding the work. [Emphasis supplied.]
The plaintiff sought defendant’s approval of its plan and received it. The specifications warned that approval would not *80 oblige tbe “government for any loss or damage resulting from the work.” We think under these circumstances that no liability can be ascribed to the defendant because it approved plaintiff’s plan of dewatering.
The plaintiff of course alleges another basis for liability in its first count. The plaintiff says the defendant should have disclosed material facts concerning conditions at the construction site, but failed to do so. The plaintiff believes the defendant should have directly stated in its specifications that the use of wellpoints was not advisable. Furthermore, the plaintiff says the defendant should have specifically mentioned the methods of dewatering which it considered suitable.
We should at this juncture turn to the specifications. We believe the specifications reveal by implication that the well-point method was not suitable since it was not mentioned, although other methods of dewatering were. Thus, the De-watering Specification reads in part as follows:[9]
1-02 Dewatering:
a. General: All pumping station work shall be carried on in areas free from water. The Contractor shall construct and maintain all necessary cofferdams or dikes, perform consolidation grouting or construct a tremie concrete seal should the contractor elect to employ such methods in the dewatering of the work * * *. [Emphasis supplied.]
We think the defendant made a reasonable effort to apprise the plaintiff of the facts disclosed by its investigations. In the specifications the prospective bidders are informed as follows:[10]
1-02 Dewatering:
a. * * *
The results of recharge tests performed in the exploratory borings are shown on sheet 51 of the drawings.
Sheet 51 either specifically states all the sources of information possessed by the Corps of Engineers from which the Government estimate of cost had been made or refers bidders to those sources.
*81 Since there has been much discussion in this case concerning the defendant’s duty to disclose its investigations, we think it should be borne in mind that the plaintiff was under a duty to investigate the conditions to be encountered at the construction site. See Puget Sound Bridge & Dredging Company v. United States, 131 Ct. Cl. 490 (1955). This duty was clearly set out in the specifications. The specifications contain the following provision:[11]
GC-3 Site Investigation and Representations:
* * * The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications, made a part of this contract. Any failure Toy the Contractor to acquaint himself with all the available information will not relieve him, from responsibility for estimating properly the difficulty or cost of successfully performing the work. * * * [Emphasis supplied.]
From the foregoing, it is clear that the defendant did not mislead the plaintiff into the use of wellpoints. Indeed, as has been noted, the specifications do not even mention well-points as a method of dewatering. The plaintiff was either specifically informed as to all the facts or directed to their whereabouts. Furthermore, the plaintiff was itself under a duty to investigate the conditions at the construction site. The plaintiff however asserts that the defendant did not inform it of its conclusions. The plaintiff states that the defendant should have promulgated with unmistakable clarity the conclusions it arrived at from the data it published. The answer to this contention is that the plaintiff did not rely on the defendant in making its determination as to which method of dewatering would be the most effective. In this fact context, we cannot say that the plaintiff would not have used wellpoints if the folly of their use had been highlighted as a conclusion in the specifications. Therefore we do not find it necessary for us to decide whether the defendant must publish the conclusions, as well as the facts, arising out of its investigations.
*82 The plain fact is that tbe plaintiff placed its trust on its subcontractor. On those occasions when the defendant suggested to the plaintiff and its subcontractor, Moretrench, misgivings about wellpoints as a method, the defendant was in effect told to mind its knitting and to stop delaying the performance of the contract. The plaintiff says that the defendant did not tell it enough. But in the circumstances disclosed here, we do not think the defendant withheld any information that was not accessible to the plaintiff. The defendant did not suggest use of wellpoints. When the plaintiff proposed them, it protested. More than this, we think, cannot be required of the defendant. We conclude that plaintiff’s first count fails to state a legally cognizable claim.
Plaintiff’s second count is that it encountered “changed conditions at the jobsite.” On June 16,1954, plaintiff made timely claim under Article 4 of the contract. The contracting officer denied plaintiff’s claim of changed conditions on July 19, 1954. Plaintiff then appealed to the Corps of Engineers Claims and Appeals Board.[12] Plaintiff says that the material was substantially different from that indicated in the specifications and consisted in large part of soft material. Plaintiff says that because of the presence of soft material the water table in the construction area was lowered. As a result, the soft material, the plaintiff alleges, was pushed aside, and water rose from below in large quantities.
In its appeal to the Corps of Engineers Claims and Appeals Board, the plaintiff presented its argument that it encountered “changed conditions at the jobsite.” The Board rejected the plaintiff’s contention in this regard on three distinct grounds. First, the Board said there was no reliable evidence that there was less rock than was indicated by the specifications. Second, the Board said it does not follow that the less rock, the more water. The Board pointed out that rock in the Everglades is a “notorious aquifier.”[13] We believe the Board was suggesting that if the plaintiff actually discovered less rock than it anticipated, then, considering the nature of Florida rock, the job of dewatering should *83 have been easier rather than more difficult. Finally, the Board concluded that the nature of the material to be excavated was only secondary evidence on the amount of water to be encountered. The reasoning of the Board on this point is based on its view that the primary evidence on water was to be found in the results of defendant’s recharge and seepage tests. However, the Board found, as we find, that the plaintiff and its subcontractor chose to ignore the defendant’s investigations.[14]
In conclusion, the plaintiff has previously brought the “changed conditions” issue before the Corps of Engineers Claims and Appeals Board and its position was not accepted by the Board. We are required to treat the Board’s decision as final unless it is shown that the administrative determination is arbitrary or capricious or is not based on substantial evidence. Volentine and Littleton v. United States, 136 Ct. Cl. 638 (1956). On reviewing the evidence we find nothing to suggest that the Board was arbitrary in its decision or that its decision is lacking in substantial evidence to support it. Therefore we find that plaintiff’s claim in the second count of its petition based on Article 4 of the contract is without merit.
There remains a final matter for our consideration. Plaintiff’s claim also includes the entire amount of the liquidated damages of $15,100 assessed by the defendant, which it claims was due entirely to the delay caused by excessive water encountered. We have found, however, that the delay in the performance of the contract was not all related to excess water encountered.[15] Moreover, we have rejected the plaintiff’s contention that the conditions encountered at the job-site were other than they should have reasonably anticipated. However, the plaintiff’s argument concerning the liquidated damages does not hinge solely on which of the parties occasioned the delay or indeed whether the entire delay was caused by excess water. The plaintiff criticizes the measure of liquidated damages assessed, and we think there is some merit in that criticism.
*84 Plaintiff was assessed liquidated damages in the amount of $200 per day for the period commencing March 23, 1956, when the project was supposed to have been finally completed, and ending on January 26, 1957, when the pumping station actually became operational, for a total amount of $61,800 in liquidated damages for that period of time. It appears to us unjust for the defendant to obtain damages of $200 per day when the liquidated damages provision of the contract specifically calls for damages of $100 per day.[16] Therefore, we would reduce the $61,800 figure by half, i.e., $30,900. We think this construction of the liquidated damages provision is in complete accord with the well-accepted rule that such provisions should be strictly construed. Tobin v. United States, 103 Ct. Cl. 480, 492 (1945). As we have said, the entire amount of liquidated damages assessed by the defendant was $75,100. If, therefore, we deduct $30,900 from this total, we arrive at the figure of $44,200 as the proper measure of liquidated damages. The plaintiff is therefore entitled to the remission of $30,900 from the amount assessed to it by the defendant.
Judgment will be entered for the plaintiff in the sum of $30,900.
It is so ordered.
Dukfee, Judge; Laramoke, Judge, Madden, Judge; and WhitakeR, Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
A. Nature of the Case
1. The Ivy H. Smith Company is and was at all times material to this case a Florida corporation with its principal office and place of business in Jacksonville, Florida.
2. On October 6,1953, plaintiff entered into a contract with defendant, identified as DA-08-123-ENG-1415, by the terms of which plaintiff agreed to furnish certain materials and to construct for the Corps of Engineers, Jacksonville District, *85 in accordance with contract requirements, a pumping station to be known and identified as Pumping Station No. 9. Said pumping station was to be located in tbe Everglades area of Florida, approximately 25 miles in a northwesterly direction from Miami, Florida.
3. The contract required that “All pumping station work shall be carried on in areas free from water.” Plaintiff encountered considerable difficulty and experienced extensive delays in dewatering the contract site; and the present suit is for increased costs claimed to have been incurred as a result of said dewatering difficulties and for remission of liquidated damages assessed by the Government due to such delays. The claim is framed in two counts, it being contended in the first count that the excess dewatering costs claimed, as well as the delays, are attributable to failure of the Government to disclose to bidders important factual information or knowledge in its possession regarding subsurface water conditions to be encountered; and it being contended in the second count that the excess dewatering costs claimed, as well as the delays, are attributable to a “changed condition” having been encountered within the meaning of that term as used in Article 4 of the contract.
B. Historical Baohground of the Project; Geology of the Area and Methods of Dewatering
4. Pumping Station No. 9 is a part of the Central and Southern Florida Flood Control Project. One of the principal purposes of said Flood Control Project is to control excess water during periods of storm or floods in the area of Lake Okeechobee, Florida, and the general Everglades area extending in a southerly direction from said lake to the lower end of the State. In a report of the district engineer for the Jacksonville District of the Corps of Engineers, dated December 19,1947 (House Document 643,80th Congress, 2d Session) , it is stated that the average annual flood damage in the Okeechobee-Everglades area is approximately $4,130,000, and that the floods of 1947, which were unusually severe, resulted in estimated damages in the East Coast areas of Dade and Broward Counties alone in the amount of $41,895,000. In the face of this situation, Congress appropriated $16,300,- *86 000 by the Flood Control Act of 1948 “for the partial accomplishment of the Central and Southern Florida Flood Control Project program as outlined in House Document 643.” Additional funds in substantial 'amounts have been appropriated in subsequent flood control acts. These funds have been and are being used for the construction of a series of dikes, canals, culverts, spillways, locks, dams, and pumping stations in the area — including Pumping Station No. 9 with which this case is concerned.
5. The ground level in the Everglades, including the section involved in this case, is only a few feet above sea level. The Everglades in general is a low swampy area, with the water table characteristically at or near the surface of the land. So far as the geology of the area is concerned, there is found near the surface in most locations a layer of peat, marl or other organic material. Immediately below this layer is a stratum of material known as Miami oolite (sometimes only a few feet in depth) which material is usually a soft type of limestone generally perforated with vertical solution holes and often highly permeable in a vertical direction but of lower horizontal permeability. Beneath the Miami oolite the area is generally underlaid by an extensive stratum (sometimes more than 100 feet in depth) of material known as the Fort Thompson formation, which is comprised mainly of structures of limestone and sandstone varying from very low permeability in the upper Everglades-Lake Okeechobee section to very high permeability in the southern Everglades area. The construction site of Pumping Station No. 9 is located in South-central Brow-ard County and in this section of the Everglades the Fort Thompson material, although highly permeable, might be described as an area of changeover from low to very high permeability. However, in any given place in the Everglades where the Fort Thompson material is found, whether it be in a locality of high, low, or intermediate permeability, there are numerous sharp variations even within very short distances both as regards the general character and composition of the material and its permeability. Therefore, knowledge regarding the subsurface conditions at a particular spot must be largely gained through borings and other *87 subsurface tests made at that spot rather than from general geological data relating to the area.
6. Several methods, and sometimes combinations of them, are commonly used in connection with the dewatering for foundations and substructures incident to construction work in this section of Florida. These methods include the following :
(a) Open pumping from excavated areas with earth dikes to control surface flow.
(b) Use of a wellpoint system — which briefly stated means that the construction area is encircled with one or more lines of horizontal pipe, called “headers”, to which are attached at regular intervals, usually every few feet, smaller pipes or “risers” about iy2 inches in diameter which extend into the ground to depths somewhat below the foundation grade level and with a screened intake section at the bottom of each of said pipes, the wellpoint itself, through which water is pumped from below up through the wellpoint pipes or risers into the header line and on out of the construction area over earth dikes that are usually installed to control surface water.
(c) Surrounding the construction area with a sheet steel cofferdam to restrain the lateral flow of water, and then pumping from within the cofferdam with open pumps to control any influx from below or leakage through the cofferdam.
(d) Installation of a cofferdam, supplemented with consolidation grouting below grade level in the construction subsurface area — the term “consolidation grouting” (or “grouting”) meaning that a cement slurry is forced under pressure into the channels or interstices of the material immediately below foundation grade level, to stop up or close the openings so as to minimize the inflow of water from below.
(e) The use of tremie seal, wherein a construction area submerged in water is excavated below grade and then filled to grade with concrete placed through pipes, thus forming a positive seal from any upsurge of water below the seal.
Combinations of these methods may be used, as for example : a steel cofferdam with open pumping and/or a wellpoint system; or consolidation grouting with open pumping; or one *88 portion of an area might be trended and another portion grouted.
The particular method or methods used in any case should be determined by the subsurface conditions prevailing at the particular site involved, and by the relative cost of and the time involved in the particular operation.
Under conditions such as existed at Pumping Station No. 9, although a wellpoint method might have satisfactorily de-watered the volume of water to be removed, its use without a cofferdam was not economically feasible because of the prohibitive cost of drilling holes for the insertion of the risers and points, and since the volume of water to be removed, computed on an open pumping basis and without prior cofferdam installation, exceeded 30,000 to 40,000 gallons per minute, the number of wellpoints and pumps required would be too costly.
C. Location a/nd Description of Pumping Station No. 9
7. The site of Pumping Station No. 9 is located approximately 18.6 miles west of the City of Dania, Broward County, Florida, at the junction of the South New River Canal, which runs east and west, and a levee known and identified as L-37, which runs north and south. The site itself is surrounded by unclaimed Everglades, characterized by a coverage of sawgrass and a surface layer of peat. The ground level at that point is approximately 8 feet above sea level. The closest road is U.S. Highway 27, which runs north and south, passing approximately one-half mile east of the station. To reach the site from this highway, construction of an access road was necessary. In view of the fact that, in connection with prior construction or improving of the South New River Canal at that point, a continuous fill 20 feet wide had been placed along its bank, the building of an access road along or near the route of this fill was entirely feasible. Such an access road would come to an end, however, at the point where it reached the borrow ditch along the east side of Levee 37, and the site of the pumping station was just across this ditch. It was necessary, therefore, in addition to constructing the access road along the canal, for an access bridge to be constructed across the L-37 borrow ditch.
*89 8. The pumping station building itself was to be constructed of reinforced concrete and masonry, and the operational equipment to be housed in it included 3 pumping units driven by diesel engines. The building was to be located for the most part within the actual area of the L-37 levee, the top of which was approximately 12 feet above ground level or 20 feet above sea level at that point. Accordingly, it was necessary to excavate a substantial segment of that levee before countinuing on down to foundation grade, which in the pumping station area proper was approximately 17 feet below mean sea level or approximately 25 feet below the general ground level.
The pumping station building was to be 99 feet long, from north to south, and about 38 feet wide. On the east or approach side of the building was the intake section, about 95 feet long and 27 feet wide, within which a so-called concrete intake slab was to be located, and on the north and south ends of the intake area certain walls, about 45 feet in length, known and identified as intake training walls, were to be placed. The placement of the intake slab required excavation in that area to depths of approximately 17 feet below sea level, and in the intake training wall areas to depths ranging from 14.5 to 3.4 feet below sea level, the depths becoming less as the walls extended away from the intake area. On the west side of the station is an area known as the discharge section, about 95 feet long and 21 feet wide, within which a so-called discharge slab was to be placed, and at the north and south ends of this discharge area discharge training walls, approximately 45 feet long, were to be located. The placement of the discharge slab, which was also to be of concrete, required excavation to depths of approximately 6 to 8 feet below sea level, and in the discharge training wall areas excavation was required to depths of approximately 5.5 feet below sea level. On the south end of the main building a further wall was to be constructed extending in a southeasterly direction from the building. This was called the east retaining wall, and excavation in this area was required to depths ranging from plus 2 feet to minus 1 foot from sea level.
*90 D. Subsurface Investigation of the Site Area by the Corps of Engineers Before Soliciting Bids
9. For a number of years before Pumping Station No. 9 was constructed, the Corps of Engineers and other agencies of the Federal Government, such as the United States Geological Survey, had been conducting extensive studies of the Everglades area, including its geology and hydrology. A number of wells had been drilled, pumping tests taken, bor-ings made and surveys conducted regarding soil and rock compositions in various parts of the area to the south and east of Lake Okeechobee. It was the purpose of the Corps of Engineers to gather as much information as possible regarding the Central and Southern Florida Flood Control area in general and particularly to assemble specific and concentrated information regarding the surface and subsurface soil and water conditions prevailing at the exact sites where flood or water control facilities were to be constructed.
10. With respect to the actual site of Pumping Station No. 9, the Corps of Engineers, for more than 2 years before bids were solicited in August 1953, for construction of said station, had been gathering information with respect to subsurface conditions at said site. Thousands of dollars had been spent for this purpose. The investigation of said subsurface site conditions included the following: In 1950 or 1951 the L-37 Levee at and adjacent to the site had been constructed, and material for the levee had been excavated from the borrow ditch located alongside the levee. A test hole more than 80 feet in depth had been drilled by the Geological Survey some years earlier at a point about one-fourth mile east of the station site. Eighteen borings were drilled at the actual site of the pumping station, 4 or which were drilled in October of 1951,11 in October, November and December of 1952, and 3 in January and February of 1953. All but the last 3 of these borings extended to depths of more than 40 feet below sea level, and, as previously stated, the ground level at the site was approximately 8 feet above sea level. In connection with 5 of the 11 bore holes which were drilled in October, November and December of 1952, so-called recharge tests were taken — which means that the holes were recharged with water to see how much could be put into a known depth of *91 open hole, the theory being that the number of gallons of water per minute that can be pumped into a hole while maintaining a constant head above the water table, will provide an indication or measure of the permeability of the stratum. In addition to the borings, a pump well had been dug at a location approximately one-fourth mile southeast of the site some time prior to November 1952 (apparently November 1951), and certain seepage test data had been gathered at that point. This latter test related almost exclusively to permeabilities of layers below minus 29 or 30.
11. On the basis of all factual information that had been collected as of November 1952 regarding the site of Pumping Station No. 9, including geological data relating to subsurface conditions at and near the site, a partial definite project report for said station, dated November 28, 1952, was prepared. At the time this report was prepared, only a portion of the 18 bore holes at the site had been drilled, including only one of the holes with respect to which recharge tests were taken, namely, bore hole No. 6. However, the other boring data gathered prior to November 1952, and the seepage test data from the nearby pumping test, were all available; also the knowledge gained through experience in excavating materials for Levee L-37 from the borrow ditch adjacent to the site of No. 9, and the large amount of geological information previously gathered with respect to the area in general. In paragraph 22 of said report of November 28,1952, under the heading “Unwatering Problems,” which paragraph was prepared by the Foundation and Materials Branch of the District Engineer’s office, the following appears:
Unwatering Problems. Large quantities of water will have to be handled in unwatering the excavation for this structure. Possible alternate methods of attack would be (1) To ring the area with a grout curtain using heavily sanded and relatively cheap grout and to pump from sumps; (2) To use sheet piling around the area and sump pumps; (3) to use a well-point system with close spacing and large pump capacities.
From the results of a pumping test performed about one-quarter mile southeast of the site, it is inferred that alternates (2) and (3) would be feasible and that the most expensive alternate (1) would not be necessary. At the referenced pump test, the foundation above Elevation *92 Minus 29 was relatively tight. The uncertainty involved in applying the data from that test to the foundation unwatering problem is recognized and more detailed studies of this feature will be made prior to final design.
12. Shortly after this report of November 28, 1952, was issued, several more borings were taken at the site and recharge tests were made in connection with 4 additional bor-ings. The Corps of Engineers, because of the results of the recharge tests, concluded that the most economical and practical method of dewatering was by the use of sheet steel cofferdam plus consolidation grouting with pumping from sumps. They also concluded that the sole use of a wellpoint dewatering system was not feasible in view of the cost of drilling, and the fact that it was estimated the water flowing into the construction area would exceed 100,000 gallons per minute unless some means were used to retard the entry of water into such area.
13. A further or supplemental design analysis report was issued under date of August 24,1953, although for the most part the data contained therein was prepared prior to August 14,1953. So far as concerns the dewatering portion of said report, it was prepared by the Foundation and Materials Branch of the District Engineer’s office on the basis of the same information as the prior report of November 28', 1952, except for data, particularly the recharge data, obtained from several additional borings taken at the site. In paragraph 10 of said report of August 24,1953, under the heading “Dewatering”, it was concluded that:
One of the major problems in the construction of the station will be the unwatering of the foundation excavation. The conditions indicated by recharge tests in the core borings suggest that unwatering by pumping alone would probably be infeasible.
14. On August 14, 1953, a conference was held in the district office in Jacksonville, Florida, attended by representatives of the Corps of Engineers from the central office in Washington, the divisional office in Atlanta, Georgia, and the district office in Jacksonville, for the purpose of discussing Pumping Station No. 9, and approving specifications for construction of said station. Although the above-mentioned *93 design analysis report of August 24,1953, had not been formally issued at that time, most of the text thereof, including that relating to dewatering, was available at the time of the conference of August 14, 1953. The question as to the amount of water that would have to be removed in dewater-ing the area was discussed at said conference, and the chief of the Foundation and Materials Branch informed the conference that from calculations based primarily on recharge test data, and also in conjunction with seepage data, it was his opinion the foundation area would hold 160,000 gallons of water per minute based on open pumping. It was concluded at the conference that a cofferdam and foundation grouting should be used to dewater the site, and that by using this method the amount of water to be removed would be reduced to 10,000 gallons per minute. The plans and specifications for Pumping Station No. 9, which were approved at this meeting, had been in process of preparation for a number of weeks.
15. After the specifications were approved and after the job was advertised for bidding, and based on all the information available to the Government at that time, the Government caused a cost estimate to be prepared, and it was concluded with respect to dewatering the area that the cost would be approximately $178,800, exclusive of profit. This computation was predicated on the use of sheet piling and consolidation grouting to accomplish the dewatering. At that time, and at all times thereafter, the Chief of the Corps of Engineers Design Branch, who was responsible for design of the Pumping Station and for preparation of the specifications, and the Chief of the Foundation and Materials Branch, who was in charge of all subsurface exploratory work at the site, were of the definite opinion that the site of Pumping Station No. 9 could not, from an economical viewpoint, be feasibly or practically dewatered with wellpoints.
E. Information and Instructions Furnished to Bidders Regarding Dewatering
16. The Invitation for Bids and the specifications as approved on behalf of the Government were released to bidders on August 24, 1953, for use in computing bids for con *94 struction of Pumping Station No. 9. They contained in part the following provisions relating to dewatering:

Invitation for Bids

6. Bidders should carefully examine the drawings and specifications, visit the site of the work, and fully inform themselves as to all conditions and matters which can in any way affect the work or the cost thereof. Should a bidder find discrepancies in, or omissions from, the drawings, specifications or other documents, or should he be in doubt as to their meaning, he should at once notify the Contracting Officer and obtain clarification prior to submitting any bid.

Specifications

GC-3 Site Investigation and Representations:
* * * The Contractor further acknowledges that he has satisfied himself as to the character, _ quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications, made a part of this contract. Any failure by the Contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. * * *
SC-7 Physical I)ata * * *
a. Surface and Subsurface Conditions: Surveys of the structure site have been made, including core borings within and in the vicinity of the limits of the Pumping Station structure, to show the elevation and conformation of the ground and the depth and character of materials existing at the site. The depth and character of materials, as estimated from these explorations, are indicated on the contract drawings.
b. Site and Weather Conditions: * * * The site of the work is surrounded by unreclaimed everglades, characterized by a coverage of sawgrass and a surface layer of peat, which under exceptionally dry conditions are very inflammable. The area is subject to tropical storms frequently accompanied by heavy rainfall from July to November. Levee 37 is a section of the main east perimeter flood water retention levee (of the C & SF Project) extending along the east edge of the everglades from north Palm Beach County to the vicinity of Homestead, southwest of Miami. Under flood conditions such as existed in 1947 and 1948, flood waters will stand as a *95 pool against tbe west side of the levee and inundate the pumping station drainage area, on the east side of Levee 37 to a depth of several feet above natural ground, until it drains off.
1-02 Dewatering:
a. General: All pumping station work shall be carried on in areas free from water. The Contractor shall construct and maintain all necessary cofferdams or dikes, perform consolidation grouting or construct a tremie concrete seal should the Contractor elect to employ such methods in the dewatering of the work, and shall furnish, install, maintain and operate all necessary equipment for dewatering the work, and maintaining the foundation free from water as required for constructing the pumping station in the dry. Where the Contractor elects to use a tremie concrete seal, other than one of sufficient depth to counteract uplift, as a dewatering method, such a seal must be provided with adequate drainage relief in the rock below the seal by construction of a system of drains leading to sumps outside the concrete.
No unwatering trenches extending below foundation grade will be permitted within an area including the complete base area of the structure and a strip 5 feet wide extending outside the base area. Trenches outside the restricted zone will be permitted provided (1) the invert of the trench does not extend below a line drawn on a 1 on 3 slope from the base of the nearest concrete and (2) that collector drains consisting of perforated pipe or open-joint tile are installed in all such trenches and the collector drains are completely surrounded by gravel filter material. If any movement of sand from the foundation into the drainage trenches occurs, the collector drains shall be immediately blocked off from the pump sumps to prevent flow in the trenches and the unwatering procedure shall be modified as necessary to prevent such subsurface erosion.
Prior to commencing any work the Contractor shall obtain the written approval of the Contracting Officer of his plan of dewatering. Approval of dewatering plans by the Contracting Officer will not relieve the Contractor of responsibility for the adequacy of the method used or from furnishing all equipment, labor and material necessary for dewatering the work, nor shall such approval be construed as obligating the Government for any loss or damage resulting from flooding the work. The Contractor will be required to employ whatever means are necessary to correct adverse conditions of *96 seepage encountered during the period of construction in order to maintain the work areas in the dry to the satisfaction of the Contracting Officer. The results of recharge tests performed in the exploratory borings are shown on sheet 51 of the drawings. Seepage tests have been conducted at a site one-quarter mile southwest of the structure. The results of these tests are available and may be inspected by prospective bidders at the Corps of Engineers District Office, Jacksonville, Florida.
b. Payment: Payment will be made at the contract lump-sum price for “Item No. 1, Dewatering”. Payment under this item shall include the cost of furnishing all labor? materials and equipment, constructing and maintaining cofferdams or dikes, consolidation grouting or tremie concrete seal, maintaining the work free from water as required throughout the construction period and the removal and disposal of material in the cofferdams or dikes at the completion of the construction * * *
1-03 Excavation; General:
^ H* íf»
The location of the subsurface explorations made by the Government are shown on the drawings for the convenience of the prospective bidders. The logs of core borings showing the types of materials that may be expected to be encountered together with the results of recharge tests, are incorporated in the contract drawings as information only. The Government does not, however, guarantee their completeness or accuracy and assumes no responsibility for deductions or conclusions drawn therefrom. The cores of the borings are available and may be inspected by prospective bidders at the Corps of Engineers Dredge Depot, 20th and Talleyrand Ave., Jacksonville, Florida.
17. Sheet 51 of the drawings reflected considerable information regarding subsurface conditions at the site, and either contained or referred bidders to all the sources of information possessed by the Corps of Engineers from which the Government estimate of cost had been made. The drawing showed the recharge tests and included logs of all 15 core borings which had been taken at the site. These logs, in addition to showing recharge test information which had been taken in the case of 5 borings, also showed the location of all borings, their depths, the classifications of material, the manner in which the borings had been taken, including whether the borings were taken by a sample spoon, and the number *97 of hammer blows per linear foot required to penetrate the material. The actual cores recovered from the 18 holes were stated in the specifications to be available for inspection by bidders.
18. The specifications contained no suggestion as to the method of dewatering that should be used. Plaintiff was not informed, either before or after its bid was prepared and filed, of the conclusion reached by the Corps of Engineers that the area could not feasibly or practicably be dewatered with wellpoints. The specifications and other contract papers contained no requirement that a cofferdam and consolidation grouting be used to dewater the area or any provision indicating this to be the method the Corps of Engineers had concluded should be used.
19. Prior to the time when the invitation for bids was issued with respect to Pumping Station 9, two other pumping station contracts had been awarded in the Central and Southern Flood Control Project — Pumping Stations No. 5-A and No. 18. The dewatering provisions in the specifications for Pumping Station 5-A included the following:
Subject to the approval of the Contracting Officer, any method of unwatering may be used. It is anticipated that an open cut excavation for the pumping station can be unwatered by a wellpoint system and protected from flooding by an earth dike.
The dewatering provisions of the specifications for Pumping Station 13, which was constructed by plaintiff, included the following:
It is considered that the work area can be best unwa-tered by a wellpoint system and protected from flooding by earth dams or sheet pile cofferdams. Subject to the .approval of the Contracting Officer, any method of un-watering may be used.
In the contract for Pumping Station No. 7, awarded after No. 9, the contract specifically required a cofferdam and tremie seal to dewater the site.
On Pumping Stations No. 5-A and No. 13, as shown above, the specifications permitted the contractors to employ any dewatering method. However, on No. 5-A the specifications pointed out that a wellpoint system was feasible, whereas on *98 Station No. 13 (which plaintiff performed), it was stated that a wellpoint system protected by earth dams or sheet pile cofferdams was the best method for dewatering. On Pumping Station No. 7, conditions were different and there was only one way that the work was permitted to be done, namely, by a cofferdam and tremie seal.
On Pumping Stations No. 2 and No. 3, the specifications required the construction of cellular cofferdams but this requirement was not contained in the specifications to enable the sites to be dewatered but was required for the safety of life in the Lake Okeechobee area.
F. Preparation and, Filing of Bid and Award of Contract to Plaintiff
20. By the terms of the bid invitation, the bids were to be opened September 29, 1953, thus permitting prospective bidders a period of approximately 5 weeks to make necessary investigations regarding the project and to prepare and file their bids. The representatives of plaintiff, who prepared or assisted in preparing its bid (1) looked over the provisions of the specifications, (2) looked at the drawings, which included the boring logs and recharge tests data reflected on Sheet 51 thereof, and (3) one of the plaintiff’s representatives visited and inspected the site of the work. At that time no examination was made on behalf of the plaintiff of the actual cores of the borings, nor of the seepage test data referred to in the specifications as being available for inspection by prospective bidders. Plaintiff’s dewatering bid was prepared on the basis of a proposal by Moretrench Corporation to furnish wellpoint equipment, and plaintiff was therefore not particularly interested in the recharge and seepage test data because of the reliance on the Moretrench Corporation.
21. The work to be performed, as shown on the bid forms and in the specifications, was comprised of 66 separately described and numbered items, the first of which was “Dewa-tering”. On or about September 25,1953, or just a few days before bids were scheduled to be opened, plaintiff received from a representative of the Moretrench Corporation, Rock-away, New Jersey, which maintained a branch office at *99 Tampa, Florida, a proposal to furnish. Moretrench. Corporation wellpoint equipment to dewater, by the wellpoint method, the construction area for Pumping Station No. 9. By the terms of the proposal, Moretrench Corporation offered to furnish the equipment on a rental basis, with costs of transporting the wellpoint equipment to the job, installing it, and operating it, to be paid by plaintiff; also a Moretrench demonstrator was to be furnished, at the expense of plaintiff, to supervise the installation at the site. Plaintiff’s bid for “dewatering” was computed on the basis of this Moretrench proposal. Under a construction contract of this general nature, it is not unusual for a contractor to make subcontract arrangements with respect to dewatering, and to prepare its bid with respect to dewatering on the basis of such a proposal. At the time plaintiff’s bid on Pumping Station No. 9 was being prepared, plaintiff was in the process of performing a contract with the Corps of Engineers for construction of .another Pumping Station (No. 13) about 8 miles east of No. 9, and the dewatering work under that contract was to be accomplished by a Moretrench wellpoint system under a similar subcontract arrangement. However, no wellpoints had actually been installed at Pumping Station No. 13 at the time Plaintiff’s bid was filed and the bids were opened for construction of Pumping Station No. 9.
22. Before submitting its wellpoint proposal to plaintiff, a representative of the Moretrench Corporation, which is one of the two largest wellpoint companies operating in Florida, secured a set of the Government contract plans for Pumping Station No. 9 from the office of the District Engineer in Jacksonville, including Sheet 51 of the drawings, showing exploratory data gathered from borings taken at the site. These plans were sent to the company’s home office at Kockaway, New Jersey, for the purpose of study and analysis by the Moretrench engineers.
Either a plan or layout was prepared in Rockaway and sent to the Moretrench Florida branch office at Tampa. This plan was altered by the manager of the Tampa office so as to decrease the amount of equipment to be furnished. As a result of this change, the Moretrench Tampa office on Sep *100 tember 25, 1953, submitted an offer to the bidders on Pumping Station No. 9, reading as follows:
Be: Pump Station #9 located 18 miles west of Nani a, Florida
Gentlemen:
In connection with referenced project we propose to furnish sufficient Moretrench Wellpoint Equipment to satisfactorily unwater the construction area to subgrade elevations indicated on contract drawings for the following rentals:
Rental for a period of three (3) months_$8,124. 00
Rental fourth month- 1, 90S. 00
Rental fifth month_ 1, 908. 00
Rental sixth month and each month thereafter_ 1, 658. 00
Eentals quoted are F.O.B. Tampa and return. Weight of equipment estimated at approximately 63,000 lbs. Freight two ways approximately $1,200.00.
Other factors to consider in preparing pumping estimate as follows:
Labor to install and remove — 800 man hours. Fuel and oil — 150 gallons Diesel fuel, 6 gallons lube oil per 24 hours. It will be necessary that system be installed under supervision of an experienced Moretrench Demonstrator. Our charge for this service to be $25.00 per 8 hour day, double time for overtime plus living and traveling expenses.
It is recommended that a Moretrench Mobile Drill be used to facilitate the installation of the wellpoints. Approximately 5 days at $60.00 per day would be required to install the wellpoints.
Dewatering will be accomplished with one stage of wellpoints in one installation. We have made borings at the jobsite and are thoroughly familiar with the existing conditions. It is our thought that earth dikes will be adequate to handle the surface water and that no diversion canal will be required.
The foregoing letter contains the following errors:
(1) Although the proposal states that Moretrench had made borings at the site, in fact, it had made only one boring;
(2) The boring which it had made was not on the site but on the other side of the canal from the site;
(3) The statement in the proposal, “we are thoroughly familiar with the existing conditions”, was inaccurate in that it was only an opinion based upon a *101 reading of the plans and the results of the single boring made off the site; and
(4) The proposal estimates approximately 5 days would be required to install the wellpoints, whereas More-trench claims this was a typographical error which should have read 25 days.
From the data shown on the boring log and the recharge data which had been read prior to sending out the proposal to bidders, the Moretrench Tampa office had estimated a volume of water which it expected to pump. The manager assisted in making calculations, estimating it would have to pump 30,000 gallons of water per minute.
23. Recharge tests were not extensively or commonly used in the Florida area here involved at the time bids were solicited for Pumping Station No. 9 in 1953. However, Paul Shea, Chief of the Corps of Engineers Foundation Materials Branch in Jacksonville, under whose direction the borings had been taken and other subsurface data regarding the site had been gathered, and George Snodgrass, Chief of the Corps of Engineers Design Branch in Jacksonville, under whose direction the pumping station was designed and the specifications prepared, were both familiar with such tests at that time. Apparently the drawings for Pumping Station No. 9 were the first ones in this South Central Florida Flood Control area to include recharge test data, which was explained on the legend of drawings (sheet 51) by a statement “Recharge Test, G.P.M. per foot of head”, with a diagram indicating how this information was shown on the boring logs. Five borings were shown to contain the recharge test data.
The Moretrench Corporation had one or two previous jobs prior to the instant pumping station where recharge tests were shown by the defendant, and both plaintiff and More-trench were aware that recharge tests were concerned with testing the amount of water in the boring and the permeability of the subsurface material by pumping water back into the borings. However, they were not equipped by knowledge or experience to attribute to these tests the significance they had for the Government officials.
24. Based on its examination Moretrench concluded that up to 30,000 'g.p.m. would be encountered in the area to be *102 dewatered. Although plaintiff was unable to furnish any computation for this determination by Moretrench, part of the determination was made by Moretrench’s Tampa office manager, Gordon B. Callender, who assisted in this determination by applying Moretrench’s previous experience in that area under similar conditions. Callender did not place much reliance on recharge tests and felt the defendant had overestimated the amount of water to be encountered.
25. As previously noted, in preparing its bid for the de-watering of the site of Pumping Station No. 9, plaintiff relied on the Moretrench proposal. Plaintiff’s bid was filed in the office of the District Engineer, Jacksonville, Florida, on September 29, 1953, the date stipulated for opening the bids
26. Plaintiff’s total bid of $839,123.85 for performing all the work in the construction of Pumping Station No. 9 proved to be low when the bids were opened September 29, 1953. This bid compares with the Government estimate based on costs of $895,366.20. Prior to making an award of the contract, it was necessary to check all bids for mathematical errors and otherwise to evaluate them from the standpoint of adequacy and compliance with Government requirements. Award of the contract to plaintiff was made October 6, 1953. Plaintiff was furnished with a form by representatives of the District Engineer in Jacksonville, entitled “Bidders Questionnaire”, which was filled out by plaintiff and returned to the District Engineer’s Office in Jacksonville. Included in the information which plaintiff was required to and did furnish on the form was a list of equipment to be employed in performing the contract work. This form which was returned to the District Engineer’s Office October 5,1953 — the day before the award was made to plaintiff — included among the items of equipment to be used by plaintiff “Moretrench wellpoint system”.
Prior to submitting its bid, and during the early phases of plaintiff’s operation at Pumping Station 13, when it became known plaintiff also intended to bid on Pumping Station 9, the assistant resident manager of Pumping Station 13 spoke informally to plaintiff’s superintendent Arthur Hamilton, plaintiff’s engineer Mr. Hightower, and a Moretrench representative at the site of Pumping Station 13, regarding the *103 possible dewatering problems at Pumping Station 9. Although the assistant resident manager had no knowledge of the data as reflected on sheet 51, he was aware that the site of Pumping Station 9 contained limestone similar to that encountered at Pumping Station 29, and he cautioned Hamilton that the contractor on Pumping Station 29 had extreme difficulty in dewatering that excavation. Hamilton, believing the Smith Company planned to subcontract this work, indicated in the presence of the Moretrenoh representative that the dewatering was Moretrench’s problem.
At the opening of bids the dewatering item of plaintiff’s bid was not read separately, but only the lump sum bids for performing the entire work. The chief of the Design Branch, who had estimated dewatering cost for the Government, and who had prepared the plans and specifications for the contract, on the way downstairs from the bid opening spoke to Lamar Smith, plaintiff’s vice president in charge of their construction division. He asked Mr. Smith what his dewatering figure was and received the reply that it was something in the neighborhood of $49,000. When he heard this he said to Mr. Smith, “Maybe you can do it, but I don’t see how,” and he told Mr. Smith in answer to a question the amount of the Government’s dewatering estimate and pointed out that the Government’s estimate for dewatering was approximately three times that of plaintiff’s bid. Plaintiff’s bid for dewatering was $46,965, whereas the Government’s cost estimate for this item was $178,800.
A day or two after the bids were opened, and prior to the award of the contract to plaintiff, Mr. Shea spoke to Lamar Smith, plaintiff’s vice president, regarding plaintiff’s low bid on dewatering. Although Smith felt he had a firm price commitment from Moretrench, he was concerned about his conversation with Shea and telephoned Mr. Callender regarding this matter. Callender assured Smith that More-trench’s estimate was the proper one, that the recharge tests shown on Government borings had proved to be wrong in other instances, and that he, Callender, did not rely on these tests.
*104 Prior to being awarded this contract, plaintiff did not request an opportunity to revise or withdraw its bid because of its reliance on the Moretrench estimate, and the defendant did not volunteer this opportunity to plaintiff.
G. Preworh Conferences and Approval of Plaintiff's Dewatering Plan
27. At a preworh conference held November 16, 1953, between officials of the contractor and officials of the District Engineer’s Office in Jacksonville, plaintiff’s vice president stated that he had received a dewatering plan from More-trench Corporation but had not yet reviewed it carefully. The dewatering plan to which he referred was one prepared by the manager of the Moretrench Tampa office, and not one prepared by engineers in Eockaway, New Jersey. It was only briefly reviewed by Government representatives at the conference, who told plaintiff’s vice president that the plan was inadequate since only one row of header pipes was indicated.
28. On November 30, 1953, a second prework conference was held to discuss the dewatering plan specifically and in more detail. At that conference Moretrench’s Tampa manager presented and discussed a dewatering plan prepared in Eockaway showing a total of three header lines. Mr. Callender stated that he believed the site could be dewatered with not more than two header lines, and that he intended to begin with one header and unless a second or third line proved necessary, it would not be installed. It was agreed by Government representatives that the procedure suggested might be followed, and that if additional headers proved necessary, they would be installed. The Government representatives asked that the plan be modified so that the header line would stay clear of a riprap area, and it was understood at this meeting that after Moretrench made this modification, its dewatering plan would be formally submitted for approval. It was so submitted by plaintiff December 22, 1953.
After receipt of the plan defendant’s project engineer on December 23, 1953, spoke to a Moretrench representative at the job and to plaintiff’s superintendent of construction. *105 Defendant’s project engineer became alarmed by the plan, especially since plaintiff’s bid for the dewatering item was considerably below that of the Government estimate. He spoke to the Chief of Foundation and Materials Branch to learn why there was such a discrepancy. He then gave further study to plaintiff’s plan as submitted by Moretrench and told plaintiff’s superintendent he did not believe the contract was a job which could be dewatered with wellpoints alone. Plaintiff’s superintendent in response said that plaintiff had a contract with the Moretrench people and “it was their baby.” Plaintiff’s superintendent further stated that one of the Moretrench representatives was at the site of Pumping Station 13 where plaintiff was using a wellpoint dewatering system, and thereupon plaintiff’s superintendent and defendant’s project engineer visited the site of S-13, and spoke to the Moretrench representatives. Defendant’s project engineer upon being asked what should be done, told plaintiff’s and Moretrench’s representative that though he did not disagree that dewatering could be done with wellpoints, he believed it could be done only in conjunction with steel sheet cofferdam. Plaintiff’s superintendent replied that any such need would have to be worked out with Moretrench. Thereupon defendant’s project engineer told plaintiff’s superintendent that until it was worked out, he would withhold approval of the dewatering plan. He withheld approval until in a telephone call from his superior, the head of the Construction Division, he was told that plaintiff’s vice president was complaining because the plan had not been approved. He was instructed that the function of his job did not include telling the contractor how to perform the work, and he was instructed to forward the plan to Jacksonville. He thereupon complied, ordering his assistant to state in the letter of transmittal that no comments were being made relative to the adequacy of the plan. Thereafter, and on January 5, 1954, defendant formally approved the plan.
This is the crux of this case: that is, whether the defendant, in view of its definite conclusion that plaintiff’s dewater-ing plan would not work, was guilty of any breach of duty and fair dealing, in failing to use more strenuous efforts to steer plaintiff away from a vain expenditure of time and *106 money in pursuing the plan of dewatering by wellpoints alone.
H. Approval of Plaintiff’s Schedule of Contract Operations
29. The contract required work to commence within 30 days after receipt of notice to proceed. Such notice was received October 23,1953, and plaintiff began on time. By the terms of the contract plaintiff was to submit to the contracting officer for approval “a practicable schedule, showing the order in which contractor proposes to carry on the work, the date on which he will start the several salient features * * * and the contemplated dates for completing the same.” Pursuant to this section plaintiff submitted a schedule which was approved by defendant’s project engineer December 11, 1953. The schedule indicated that dewatering work would begin about the middle of February 1954.
I. Plaintiff’s Wellpoint Dewatering Operations
30. The preliminary work incident to dewatering, such as hauling wellpoints and drilling equipment to the site, began approximately at the time scheduled by plaintiff and actual drilling of wellpoint holes began February 22, 1954. Prior to the drilling plaintiff had excavated overlying material down to approximate elevation plus 4' or 5'. Moretrench’s original proposal to plaintiff had stated that installation of the wellpoints would require 5 days. However, the More-trench representative testified that this was a typographical error which should have been reflected as 25 days. From the outset, difficulty in the drilling of wellpoint holes was experienced, due to the fact that the rock encountered was harder and more difficult to penetrate than Moretrench officials had contemplated. At that time Moretrench Company had one drill rig mounted on a truck on the site. When drilling started the auger broke in the first foot of material. A similar auger was brought in, which also broke. Thereupon Moretrench’s representative on the job stated that different drilling equipment would have to be secured. More-trench delivered several different types of rigs to the job, even bringing one from Texas, which also did not function *107 properly. Later, Moretrench brought in three portable-type rigs which required use of a crane to hold them upright, and with these eventually drilled all the holes. Plaintiff and Moretrench were unable to install the first wellpoint until March 23,1954, on which date they sent 14 wellpoints.
31. While wellpoints were being installed, plaintiff was engaged in excavating rock by drilling and blasting with dynamite. It is not known what effect, if any, the blasting had on the rock at various elevations in and around the pumping station area, but no contention is made by defendant that plaintiff violated the specifications or damaged the foundation in performing such blasting.
32. By May 12, 1954, a total of 305 wellpoints had been installed and by May 26, a total of 406. By June 13 plaintiff had installed two headers with approximately 500 well-points. In addition to other pumps attached to the header lines plaintiff used two couch pumps for open pumping. The volume of water encountered was too great for plaintiff to lower the water and hold it at a point much below elevation zero. On June 13, 1954, plaintiff conducted an extensive pumping test using its two header lines and approximately 500 wellpoints together with 18 or 20 pumps operating, for the purpose of determining the extent to which the area could be dewatered with all the facilities then installed. Plaintiff calculated that on this test it was removing 45,000 gallons of water per minute. This resulted in lowering the water only to about elevation minus 1.5 or minus 2 feet. Plaintiff’s superintendent had learned that the defendant had calculated that approximately 160,000 g.p.m. would flow from the area to the dewatered, and so advised Moretrench’s chief engineer during this test. More-trench’s chief engineer, who conducted the test, calculated that the volume of water would exceed 100,000 gallons per minute and that in order to bring it down to the level necessary to permit construction work to proceed in the dry at grade level minus 17 feet, 3,600 additional wellpoints would be necessary or a total of 4,100 in all. It was therefore concluded by plaintiff and Moretrench on June 14, 1954, that dewatering by wellpoints alone would not be feasible, and that the wellpoint operation should be aban *108 doned. Plaintiff wrote to the district engineer under date of June 16, 1954, notifying him of plaintiff’s decision to abandon wellpoints and requesting authority to change to a different dewatering method. A meeting was held in the office of the district engineer on June 17,1954 with plaintiff’s representatives to discuss the dewatering problem. At that meeting plaintiff stated it proposed to discontinue the well-point operations and utilize a sheet steel cofferdam in conjunction with consolidation grouting or a tremie seal. Plaintiff was instructed to submit such a revised dewatering plan for approval.
J. Period of Changeover From Wellpomt to Cofferdam and Consolidation Grouting Operations
33. After the decision was reached to abandon the use of wellpoints, plaintiff engaged a consulting engineering firm in Miami, Jorgenson & Schreffler, to study the matter and prepare a new dewatering plan. Such a plan was prepared and submitted to the Corps of Engineers in final form on August 31, 1954, and was approved in September 1954. According to the plan as approved the cofferdam was to be installed in stages, with the main building area to be first encircled with sheet piling, dewatered and excavated to grade; the discharge area and the discharge wingwall areas then being surrounded by separate cofferdams and de-watered; the intake area to be similarly dewatered as the next step; with the intake wingwall areas to follow as the final step. The retaining wall area on the south side of the main building and the southwest training wall on the discharge side were actually dewatered with open pumping without the use of cofferdams.
34. During the period of changeover, a number of laborers were laid off. In order to keep plaintiff’s organization together the key men were utilized in doing odd jobs, such as repairing equipment, painting trucks, etc. Some of them were used at Pumping Station 13, which was being constructed by plaintiff for the Corps of Engineers at the time, and which was located about 12 or 13 miles east of Pumping Station 9. A number of machines were idle during this *109 period. This equipment could not be utilized economically on other jobs, nor could it be rented for the short period of time before it was expected to be again needed at Pumping Station 9. The Government officials issued no complaints or criticism of plaintiff’s handling of problems incident to the changeover from wellpoints to cofferdam and consolidation grouting.
K. Dewatering With 0'offerdam and Consolidation Grouting
35. The ideal method of placing consolidation grouting is to force grout into the voids at sub-foundation elevation before excavation has been performed above that elevation to any appreciable extent. However, as plaintiff in connection with its wellpoint system had excavated approximately two-thirds of the area of the main structure down to approximately elevation minus 15, it was first necessary to backfill the excavated area, especially in order to place equipment at those portions of the site and in order to drive sheet piling for the cofferdam. The backfill had to be sufficient to bring the elevation of the excavated area back to about minus 4. Had plaintiff installed the cofferdam at the outset of its de-watering activities, and had it not attempted to use wellpoints, the placing of this backfill and subsequent removal would not have been necessary.
36. Plaintiff installed its first-stage cofferdam around the main building area with reasonable dispatch and completed such driving early in December 1954, prior to commencing its grouting operations. After the first stage cofferdam had been installed and the area grouted, it was necessary to excavate the area to grade which included removing the back-fill. The remainder of the excavation work other than removal of this backfill, involved previously undisturbed material chiefly in the south one-third of the main structure area, and all material between elevation minus 15 and final grade of minus 17, no backfill having been placed at these levels in any part of the construction area.
37. Plaintiff operated with considerable difficulty in de-watering most parts of the construction site after the changeover from wellpoints to the sheet steel cofferdam with consolidation grouting. Plaintiff had not previously had *110 experience with consolidation grouting, nor bad its superintendent, Arthur Hamilton. Although plaintiff was furnished pamphlets by the Corps of Engineers regarding foundation grouting, plaintiff did not follow the suggested method, nor use the suggested grouting equipment, with the result that grouting was not as successful as had been contemplated by plaintiff. Grouting operations were inefficient, time consuming, and many areas had to be regrouted several times with only limited success. Dewatering difficulties were complicated in certain areas by excavation which had been performed prior to grouting, and by certain wellpoint and core holes which apparently could not be grouted successfully, and caused boils in the area. Plaintiff’s personnel were not skilled in the use of the grouting equipment, and its operations lacked proper coordination, planning and supervision.
Some lost time and! additional expense of an indeterminable amount resulted from this grouting operation.
L. Post Dewatering Work; Construction of the Pumping Station
38. After the main building area had been dewatered and excavated to grade, it was possible to start the work on the structure itself while the work of dewatering and excavating the other areas was continuing. The first concrete pour in the substructure of the main building area took place on March 22, 1955.
Plaintiff’s operations lacked efficiency after the pouring of concrete began on March 22, 1955, largely because of lack of skilled personnel, and also because of the lack of coordination and planning.
M. Appeal Before the Corps of Engineers Claims and Appeals Board
39. By letter dated June 16, 1954, plaintiff made timely claim under article 4 of its contract, which provided as follows:
4. Changed Conditions. — Should the contractor encounter, or the Government discover, during the progress *111 of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the contracting officer shall be notified promptly in writing of such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
40. The contracting officer denied plaintiff’s claim of changed conditions, by letter dated July 19, 1954. Thereafter, plaintiff made timely appeal, under clause 6 of its contract, to the Corps of Engineers Claims and Appeals Board, hereinafter referred to as the “Board”. This clause provided as follows:
Clause 6. Disputes. — Except as otherwise provided in this. contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall unless determined by a court of competent jurisdiction to have been fradulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
*112 41. Plaintiff phrased its complaint before the Board as four correlated claims as follows:
Claim I. Incorrect information regarding, subsurface conditions was shown on the plans furnished to the contractor by the Government.
Claim II. The contractor encountered excessive amounts of subsurface water after he had begun the necessary excavations.
Claim III. The Government, as a result of extensive investigation, had knowledge of the conditions which they did not relate to the bidders.
Claim IY. The Government allowed the contractor to use wellpoints when the Government knew that well-points would not work on this particular project.
A transcript of the Board’s hearings, its conclusions and decision was placed in evidence before this court as plaintiff’s exhibits 51 and 52.
42. The Board concluded on July 23, 1957, that with respect to plaintiff’s claims III and IV, they represented actions for breach of an implied obligation of the contract or for misrepresentation by silence when there existed a duty to speak. The Board found that no administrative avenue existed for consideration of such claims, and that it was without jurisdiction to consider them. Accordingly, the Board made no decision with respect to plaintiff’s claims III and IY. However, the Board made the following conclusions of fact regarding these two claims:
L The Government furnished prospective bidders with all the factual data in its possession bearing on the question of water inflow at the project site.
2. This data was sufficient upon which to formulate a reasonably accurate opinion with respect to water inflow at the site.
3. The Government did formulate an opinion, by the application of certain geological, engineering and mathematical knowledge, as to the gallon per minute inflow to be anticipated. It did not convey this opinion to prospective bidders.
4. This geological, engineering and mathematical knowledge might or might not be available within a contractor’s organization, depending upon its size, but it would be readily available knowledge to anyone seeking it.
*113 5. The Government’s motive in not setting forth for prospective bidders the quantity of water which it expected was that there could be variations of results in making these computations, and it is not Government policy to compute quantities of various materials to be encountered, but rather to furnish the data upon which such quantities can be computed.
6. Neither appellant nor his dewatering subcontractor examined all the data made available by the Government on the subject of dewatering. They concluded that far less water would be encountered than the Government anticipated.
7. They further concluded that a wellpoint system (the subcontractor’s specialty) would satisfactorily de-water the site. That Government was, and still is, of the opinion that a wellpoint system would not be a satisfactory or practicable means of dewatering the site. It did not express this opinion to prospective bidders.
8. In the case of two prior Pumping Station projects, the Government had expressed an opinion as to the method of dewatering which would probably suffice. It did not do so in this case other than inferentially. Paragraph 1-02 of the specifications above quoted does not mention wellpoints, and it does refer to “cofferdams or dikes * * * consolidation grouting * * * tremie concrete seal * * the method finally employed with success.
9. After award but prior to commencement of work by the wellpoint method, Government representatives conveyed their opinion to representatives of appellant’s dewatering subcontractor that wellpoints would not be practicable, but the latter disputed this opinion and the amount of water contemplated by the Government and preferred to rely upon his own data.
10. The Government, under paragraph 1-02 above-quoted, initially without comment, approved appellant’s proposal to dewater by wellpoints, knowing Moretrench’s anticipated gallonage, although it was of the opinion that this was not practical because of the higher figures it possessed.
11. It initially approved the wellpoint method without comment because its own conclusion that wellpoints were not practicable was an opinion, and was in conflict with the opinion of Moretrench, an expert in the wellpoint field.
*114 43. With regard to plaintiff’s claims I and II, the board concluded as follows:
There remains for consideration under Article 4 of the contract, those claims designated I and II. To prevail under that article, appellant should demonstrate that the subsurface conditions he encountered differed materially from those shown, or in the alternative, were unusual or unknown in work of this character. We must conclude from the evidence that neither of these alternatives is supported.
Appellant had all the data available to the Government on probable water conditions. Properly evaluated, this data forecast the amount of water actually encountered. Nor was there encountered an unknown or unusual condition, not normally inhering in work of this character. The site was at the intersection of two canals. Excavation was to take place at the edge of the everglades in low-lying Florida, well-known for its subsurface water conditions. Specification Section 1. was devoted in large part to the subject of “dewatering” and the first payment item in the contract covered that subject.
To counteract this, appellant urges that he encountered less rock and more soft material than indicated by the Government borings, and this was the reason he encountered more water than anticipated. There is a threefold difficulty with this argument. Firstly, there is no creditable evidence that there was less rock than indicated by the borings, because the borings did not indicate solid rock, but rather fractured rock layered with other material. Appellant’s evidence to the contrary consists of observations of witnesses after the whole area had been disturbed, and borings taken under similar circumstances by less effective means than those employed in drilling the Government cores.
Secondly, a diminution in rock does not connote an increase in water, but rather the opposite. The fractured, fissured, solution ridden limerock of Florida is a notorious aquifer. This is not only confirmed by Government witnesses but by appellant’s assistant superintendent, whose testimony is set forth in part, above. On the contrary, sand is a more effective aquaclude, as evidenced by the fact that appellant had relatively little difficulty at Station 13 which involved sand excavation, and he was able to dewater with wellpoints. It is apparent that wellpoints are less effective in solution ridden, fissured, fractured rock because they must intercept *115 the water to carry it away, whereas in sand they are able to draw the water down, creating a “cone of depression” in which work may be carried on in the dry.
Finally, the nature of the material to be excavated is in this case only secondary evidence on the amount of water to be encountered. The primary data on water were contained in the recharge and seepage tests conducted by the Government, which appellant and his subcontractor apparently elected to ignore.
In the last analysis, appellant seems to have relied more upon his subcontractor than upon the data advertised and made available by the Government, and this is confirmed by the Federal Court suit now pending between the parties to that subcontract. That action will determine whether wellpoints failed because they were not feasible for this project, or because they were improperly utilized. But that is not an issue in this appeal and no appreciable evidence was taken thereon.
The foregoing considered, this appeal must be, and the same hereby is, DeNied.
N. Delay Attributable to Water in Excess of That Oontem-plated by Plaintiff
44. Plaintiff’s original progress schedule, approved by defendant on December 11, 1953, reveals that it had planned to make the first concrete pour of the substructure probably in the latter part of February 1954. This schedule was based on Moretrench’s erroneous calculation that the wellpoints could be installed in 5 days. Two headers of the approved 3-header wellpoint system had been installed by early June 1954. Had the wellpoints proved feasible, the third header probably could have been installed and the area sufficiently dewatered for the first concrete pour of the substructure in about early July 1954. Since the first pour took place on March 22, 1955, there was a delay of approximately 8y2 months in dewatering.
An undetermined amount of this 8 y2 months’ delay was due to the contractor’s inefficient operation in grouting, and lack of skilled personnel. (Findings 35-37.) It is reasonable to conclude that plaintiff’s delay in dewatering, due to water in excess of that contemplated, was approximately 7 Yz months.
*116 0. Costs Attributable to Dewatering
45. During the period of contract operations prior to July 1, 1954, and while the wellpoint dewatering operations were taking place, dewatering costs were not kept in a separately labeled bookkeeping account in the books and records of the company. However, the books were kept on such a basis that it was possible to segregate wellpoint dewatering costs from other contract costs and determine definitely the amount thereof. Beginning with July 1,1954, shortly after the decision to abandon wellpoints had been reached, plaintiff set up on its books a new account, identified as the X-10 account, for the purpose of thereafter separately keeping all cost items relating to dewatering. The dewatering costs were kept separately in this account during the period July 1, 1954, to March 23, 1956, which was the final expiration date as extended by change orders for timely completion of all the contract work.
46. Plaintiff claims $616,179.76 as excess costs due to de-watering difficulties. This amount includes plaintiff’s total expenses for dewatering both by wellpoints and by the sheet steel cofferdam with consolidated grouting method, plus certain other non-dewatering expenses which it attributes to the dewatering operation, less its prior anticipated cost of dewatering by wellpoints alone. Plaintiff also claims $75,100, the entire amount assessed by defendant for liquidated damages.
47. Of the amount of $137,243.36 claimed as “Cost of using other equipment, including company-owned equipment and equipment rented from outsiders,” a total of $38,989.97 related to the use of equipment directly in dewatering operations between July 1954 (after wellpoint operations ceased) and March 23, 1956 (date for timely completion of the contract) , and which were included in the separate X-10 account. For the period subsequent to March 23, 1956, when the de-watering costs were no longer being separately kept, the plaintiff in computing its claim for cost of using other equipment, included all such equipment costs incurred between March 23,1956, and the date dewatering work was concluded. This was done on the basis that if dewatering difficulties had *117 not been encountered the contract work would have been completed on time and no such equipment rental or operating costs would have been incurred after that date. The total equipment use costs incurred during that portion of the contract period after the expiration date for timely completion (March 23, 1956) and while dewatering work still continued (pumping, etc.), amounted to $98,253.39. The portion of this sum covering use of equipment actually engaged in dewatering activities during this period amounted to approximately $29,815.89.
48. Of the amount of $36,350.48 claimed as “Equipment Repairs”, a total of $7,080.69 relates to repairs incurred incident to dewatering activities for the period July 1, 1954, to March 23, 1956, and which were included in the X-10 account. Of the balance of $29,269.79, which covered all repairs to equipment after March 23, 1956, and while de-watering work still continued, a total of $5,414.63 represented the approximate amount expended in connection with dewatering work performed after March 23, 1956.
49. Of the amount of $50,783.37 included in the claim as “Equipment Fuel Oil,” a total of $26,687.15 covers fuel oil used in dewatering operations during the period July 1, 1954, to March 23,1956, and which was included in the X-10 account. Of the balance of $24,096.22 a total of $20,409.35 represents the approximate amount expended for fuel oil in connection with actual dewatering work performed after March 23,1956.
50. Defendant conducted an audit of plaintiff’s books and records and questioned certain items claimed by plaintiff as cost of dewatering and eliminated them from its computation of plaintiff’s total dewatering costs. Defendant questioned an amount of $1,315.40 which was a pro rata portion of Equipment, Fuel, and Repairs, etc., which was charged to the wellpoint dewatering operation. This amount was based on a percentage of these average costs for the preceding months and is a proper expense and apportionment of dewatering.
Defendant questioned an amount of $12,625.33 of Equipment Repairs, and $14,937.72 for Equipment, Fuel and Oil. These amounts were comprised of many invoices of items *118 which were not verified, by the defendant. There was no question but that these costs were actually incurred and they should properly be included in this claim for proration to dewatering costs.
An item of $7,952.19 was claimed as extra time and expense of plaintiff’s vice president, incurred as a result of dewater-ing. This item included many invoices and primarily was comprised of the salary of plaintiff’s vice president, and certain legal fees. These items should have been included in plaintiff’s overhead and were properly excluded by defendant as a direct charge to dewatering.
51. The following is a schedule of plaintiff’s dewatering expenses:

Dewatering 6y Wellpoints

Direct costs:

Build dikes, labor- $729.48
Installing and removing wellpoints and operating pumps on same, labor_ 20,141. 31
Prorata portion job overhead_ 4, 017.24
Prorata portion of equipment, fuel, repairs, etc_ 28, 878. 57
Prorata portion of payroll, tax and insurance_ 1, 553. 69
Rental Moretrench equipment_ 11, 750.00
$67, 070.29

Indirect costs:

Prorata portion home office overhead_
5, 540. 94
Cost of dewatering with wellpoints.
$72,611.23

Dewatering After Abandonment of Wellpoints

Direct costs:

Sheet piling (material only)_ $26,105. 62
Cement for grout (material)_ 13, 568.72
Purchase of special equipment_ 15,148. 74
Cost of equipment including company-owned and rented_ 68, 805. 86
Equipment repairs_ 47, 096. 50
Equipment fuel and oil_ 12, 495. 32
Special engineering services_ 7, 603.48
Miscellaneous material & supplies_ 8, 746. 63
Labor & payroll taxes_ 155,708. 08
W/C, P.L. and P/D ins. on labor at 3.608 percent_ 5, 480. 08
$360, 759. 03

*119
Indirect costs:

Prorata portion of home office overhead-40, 584 93
Cost of dewatering after wellpoints abandoned_ 401,343. 96
Total cost of dewatering_ 473, 955.19
52. Plaintiff estimated dewatering costs of $46,965, which amount included its profit, at the time it submitted its bid. This estimate did not take into consideration Moretrench’s erroneous calculation as to the hardness of the rock in the installation of wellpoints, which was in no way connected with the difficulties encountered with respect to excess water.
Plaintiff’s actual cost of dewatering with wellpoints totaled $72,611.23 up to the time this method was abandoned in June 1954. At that point, plaintiff had installed only two headers of wellpoints of the three header system contemplated by the approved Moretrench plan. Additionally, the $11,750 shown as rental of Moretrench equipment in plaintiff’s costs, was a compromise settlement of a Moretrench bill of about $24,000. Had the wellpoint method of de-watering proved feasible and had plaintiff installed the third header of wellpoints, and continued the rental of this equipment until March 1, 1955, as contemplated on the original progress schedule, the cost of dewatering by wellpoints would have been at least $100,000. In addition, since the original schedule contemplated wellpoint installation in 5 days, whereas actually this would have required about 4 months, this would necessitate rental of the equipment to about July 1, 1955, rather than March 1, 1955.
Since plaintiff’s total costs for dewatering were $473,955.19, its excess costs would be no more than $373,955.19.
53. The overall completion of plaintiff’s contract was delayed 381 calendar days beyond the contract period, as extended. The delay reasonably attributed to excessive water and the plaintiff’s change in dewatering operations was approximately 225 calendar days (7y2 months). (Finding44.)
In order to expedite the completion of the work the plaintiff employed night shifts during much of the time. Based upon its previous experience, the plaintiff determined that there was a loss in efficiency of 25 percent by its labor per *120 formance on the 3 p.m. to midnight shift, and a loss in efficiency of 40 percent on the midnight shift as compared with performance by the regular day shift. Additional overtime work was performed by its supervisory personnel and others in efforts to make up lost time.
The plaintiff’s increased costs by reason of the loss in efficiency of its night shifts, based upon the foregoing percentages, and the premium pay for excessive overtime by its other personnel amounted to $78,017.83. There is no substantial evidence for any determination of time that was made up by reason of the employment of night shifts and additional overtime by other personnel. As measured on the actual delay in completion, this excessive cost amounted to $204.77 a calendar day ($78,017.83-J-381). The amount attributable to the dewatering delay of 225 days is $46,073.25.
54. The plaintiff also incurred certain continuing expense during the 381 calendar days of delay in the completion of its contract. Plaintiff claims additional cost for the use of its equipment during this additional period, for purposes other than dewatering operations. The plaintiff’s use and expense of this equipment, including rental, fuel, oil and repairs for the additional 381 days of performance on this contract amounted to approximately $95,979.53, or $251.91 a calendar day ($95,979.53^-381). The cost of the equipment attributable to the dewatering delay of 225 days is $56,679.75.
55. Plaintiff’s claim also includes the entire amount of the liquidated damages of $75,100 assessed by the defendant, which it claims was due entirely because of the delay caused by excessive water encountered. The specifications state as follows regarding liquidated damages:
SC-2 Liquidated Damages:
a. In case of failure on the part of the Contractor to complete that part of the work designated in paragraph SC-la by the date of completion established in that paragraph or any extensions thereof, the Contractor shall pay to the Government as liquidated damages the sum of $100.00 for each calendar day of delay until the work specified in that paragraph is completed or accepted.
*121 b. In case of failure on the part of the Contractor to complete the entire work by the date established in paragraph SC-lb, or any extensions thereof, the Contractor shall pay to the Government as liquidated damages the sum of $100.00 for each calendar day of delay until the entire work is completed or accepted.
The specifications required Pumping Station 9 to be complete and ready for efficient operation not later than October 31, 1955, and entirely completed by December 31, 1955. (SC 1 of Specifications.) Plaintiff was given extensions for changes of 82 days to January 22, 1956, for the project to be operationally complete, and to March 23, 1956, for the completion of all contract work. These extensions were not related to dewatering. The station was operationally completed by plaintiff on January 26, 1957, 370 days after the contract requirement, and was entirely completed on April 8, 1957, 381 days later than as required by the contract. Liquidated damages were assessed as follows:
January 22, 1956 to March 23, 1956 (61 days) at $100 per day_$ 6,100. 00
Marcia 23, 1956 to January 26, 1957 (309 days) at $200 per day_ 61, 800. 00
January 26, 1957 to April 8, 1957 (72 days) at $100 per day- 7,200. 00
Total_$75,100.00
Since plaintiff’s excessive delay attributable to dewatering was approximately 225 days, it was assessed liquidated damages due to this delay for about 225 days at $200 per day, equal to approximately $45,000.
56. Plaintiff’s total excess costs due to the dewatering operation are approximately as f ollows:
Excess cost of dewatering_$373, 955.19
Prorata portion of additional overtime and inefficiency_ 46, 073.25
Prorata portion of additional equipment rental, fuel, oil, and repairs_ 56, 679.75
Prorata portion of liquidated damages_ 45, 000. 00
$521,708.19
*122 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of thirty thousand nine hundred dollars ($30,900.00).

 See finding 4.

 See finding 10.

 See finding 12.

 See finding 14.

 See finding 18.

 See finding 28.

 See finding 28.

 See finding 16.

 See finding 16.

 Id.

 Id.

 See findings 39 and 40.

 See finding 43.

 Id.

 See finding 55.

 Id.